431 So.2d 824 (1983)
Otis Terry McCOY, Plaintiff/Appellant,
v.
The KROGER COMPANY, et al., Defendants/Appellees.
No. 15179-CA.
Court of Appeal of Louisiana, Second Circuit.
May 3, 1983.
*825 Bethard & Davis by James G. Bethard, Coushatta, for plaintiff/appellant.
Lunn, Irion, Switzer, Johnson & Salley by Frank M. Walker, Jr., Shreveport, for defendants/appellees.
Before PRICE, HALL, MARVIN, FRED W. JONES, Jr. and SEXTON, JJ.
SEXTON, Judge.
The plaintiff Otis Terry McCoy filed this cause seeking workmen's compensation benefits, penalties and attorneys' fees from his employer, the Kroger Company, and Kroger's compensation insurer, Firemen's Fund Insurance Company. Plaintiff has perfected the instant appeal from the judgment of the trial court rejecting his demands. We reverse.
The plaintiff McCoy was 27 years old at the time of the trial. He had worked as a grocery clerk for several companies since graduation from high school, and had been employed by the defendant Kroger since 1976, working principally in the produce department. His duties included the loading and unloading of produce, the stocking of grocery items, the cleaning of coolers and other related work. These duties required constant standing and walking.
In 1978, the plaintiff testified, his feet began to bother him and grew progressively worse. He stated the problem started as a "little blister" and progressed to the point that there were hard blisters all over the bottom of his feet which were milk white and rock hard. He testified that he felt that he was walking on marbles or rocks and to obtain relief would often remove his shoes and walk into the cooler. He stated that he continued to work while receiving conservative treatment from Dr. Fred Spencer Willis of Coushatta, though the pain often brought tears to his eyes and caused him to suffer the ridicule of his fellow employees who referred to him as "duck-foot" or "web-foot."
Dr. Willis testified by deposition that he first saw the plaintiff in November of 1977 for the complaint of foot pain. Dr. Willis found multiple bunions and corns at that time, which he treated conservatively by trimming. After periodic visits for the same problem yielded no relief, Dr. Willis referred the plaintiff, in July of 1980, to Dr. D.E. Gamble, a Shreveport podiatrist. Dr. Willis testified that the condition of the plaintiff's feet was unusual and was caused *826 by pressure. He further stated that he had seen the plaintiff's feet swollen and blue, which condition was likely due to poor circulation. Dr. Willis did not believe that the plaintiff would be able to engage in work which involved a good deal of walking and standing.
Dr. Gamble saw the plaintiff July 25, 1980, and operated on him on August 1, 1980, for a condition which he said included flat feet, callouses and poor circulation. He basically described the operation as the surgical removal of boney growths and enlargements and an enlarged nerve or tumor. Dr. Gamble related the plaintiff's poor foot circulation to his flat feet or the collapse of the arches. However, he also stated he found no evidence of strain or sprain in Mr. McCoy's feet.
Although there was some confusion as a result of some forms found in Dr. Gamble's file at the trial of the case, Dr. Gamble adamantly maintained that the plaintiff's condition was caused by his employment and that he could not return to the work which he was doing, though he testified that plaintiff was susceptible to rehabilitation.
Dr. E.C. Simonton, Jr., an orthopedic surgeon, who also testified by deposition, stated that he saw the plaintiff at the request of the defendants in July of 1981, almost a year after Dr. Gamble's operation. He testified that the plaintiff told him that his condition was not significantly improved by the operation. He found no swelling or tenderness and felt that the plaintiff could perform the regular and routine tasks required of a grocery clerk. He further testified that while he found no evidence of the swelling or discoloration normally associated with poor circulation, such a condition would be improved by walking. Dr. Simonton did testify, however, that he found a boney irregularity present which was probably the result of an old, healed, stress fracture in the foot. Dr. Simonton testified that he was familiar with the surgery performed by Dr. Gamble and that while he himself performed foot surgery, he would not have used the procedures employed by Dr. Gamble in treating Mr. McCoy's condition.
It should be noted that prior to seeing Dr. Gamble, the plaintiff saw Dr. Don Burt, an orthopedic surgeon, who prescribed special shoes which the plaintiff testified helped him to a limited degree. His immediate supervisor in the produce department, Mr. Corrao, as well as another supervisor Mr. Neal, testified that the plaintiff did not like the shoes, thought that they were unattractive in appearance, and stated that he was not going to wear them. They testified they seldom saw him wear them. Plaintiff testified that he wore them for a number of weeks as prescribed by Dr. Burt, with little real relief. Dr. Gamble testified that this particular conservative approach is usually insufficient to remedy the problem which plaintiff had.
The plaintiff's parents and a neighbor verified that plaintiff was a very active young man until his feet began to trouble him, enjoying not only his job but all types of yard work, home maintenance and repair work. All three confirmed the plaintiff's assertions that his feet would discolor and swell. Additionally, his parents testified that their son's feet often bothered him to such an extent that he was unable to sleep and feared working the next dayalthough he always reported to work until such time as Dr. Gamble's surgery. They also confirmed his testimony as to the onset and nature of the blisters on his feet.
The testimony of the supervisors and the store manager, Mr. Gullo, confirmed the plaintiff's testimony that he was a consistent and punctual employee. Both Mr. Corrao and Mr. Gullo testified that when the plaintiff attempted to return to work some six months after surgery, his old job in the produce department was not available and the plaintiff was assigned other similar duties. They stated that he was unhappy with the new assignment and did not report to work in that capacity.
The trial court denied recovery on the basis that the plaintiff's condition was neither an occupational disease as set forth in LSA-R.S. 23:1031.1 nor was it "accident" *827 related. On appeal the plaintiff contends that an accident did occur within the meaning of the workmen's compensation law, and that as a result of his condition plaintiff is totally and permanently disabled.
The plaintiff is entitled to compensation benefits if he can prove that he has received "personal injury by accident arising out of and in the course of his employment, ...." LSA-R.S. 23:1031.
We have no basic difficulty with the proposition that plaintiff has received personal injury in the course of his employment. Personal injury is defined in our compensation law by LSA-R.S. 23:1021(6), which states:
"(6) `Injury' and `personal injuries' include only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted."
We believe that the record shows that the plaintiff's foot condition was caused by the abnormality of his particular feet, compounded by the constant walking and standing which his job required. The testimony of both treating physicians, Dr. Willis and Dr. Gamble, is, in our view, to this effect.
The real issue in this cause is whether an accident, within the meaning of the compensation act, has occurred. That term is defined by LSA-R.S. 23:1021(1):
"(1) `Accident' means an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury." (emphasis added).
In support of his contention that he has suffered a compensable accident plaintiff has referred us to certain jurisprudence of this Circuit. Particularly he asserts that Lum v. Employers Mut. Lia. Ins. Co. of Wis., 216 So.2d 889 (La.App. 2d Cir.1968), Hall v. Georgia-Pacific Corp., 390 So.2d 948 (La.App. 2d Cir.1980), and Harper v. Kast Metals Corp., 397 So.2d 529 (La.App. 2d Cir.1981), are supportive of his position.
In Lum the plaintiff was employed stuffing giblets into partially frozen chickens. This plaintiff suffered from pre-existing arthritis which was aggravated by this action. The opinion notes that each act of stuffing chickens caused the plaintiff some pain, but found that on one particular occasion a sudden popping of plaintiff's wrist occurred. In Hall the plaintiff worked in a lumber mill pulling plywood. He contended that he experienced a sudden popping in his shoulder in the course of working with the plywood. The medical evidence indicated that the plaintiff had aggravated a pre-existing automobile injury which he had concealed from his employer. The plaintiff in Harper was a manual laborer who was required to continuously lift heavy metal products, causing soreness in his wrists. On a specific date the plaintiff testified that he twisted one of his wrists. The medical evidence indicated this action was the final aggravation of a pre-existing arthritic conditionthus the diagnosis was traumatic arthritis.
In all three cases the plaintiff's "accident" was the end result of continual aggravation of a pre-existing condition by repetitive movements required by the plaintiff's employment. However, we should note at this juncture that in each of these cases the court found a specific incident, or point in time, at which the affected part of the plaintiff's body gave way finally and conclusively. In other words there was, as in the case at bar, a continuous stress or tension which caused significant aggravation to a pre-existing condition. But, in contrast to the case at bar, there was a single and final point of collapse which was said to be the "accident."
In Hall we noted:
"Our jurisprudence has given an extremely broad interpretation to the definition of `accident', holding that strain or exertion can supply the necessary violence. Dortch v. La. Central Lumber Co., 30 So.2d 792 (La.App. 2d Cir.1947). Furthermore, `when the performance of the *828 usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present.' Ferguson v. HDE, Inc., La. 270 So.2d 867 (1972)." Hall, supra, at 949-950. (emphasis added).
In Harper this Court, in complimenting the trial judge and adopting his view as its own, made essentially the same statement:
"`Louisiana courts have broadly interpreted the term "accident" as defined in R.S. 23:1021(1) to the point that the statutory requirements for an accidental injury are present "... when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown." Ferguson v. HDD (sic), Inc., 270 So.2d 867 at 869 (La.1972). See Malone and Johnson, Workers' Compensation 2d Ed. Sections 211-217 (1980), Louisiana Civil Law Treatise.'" Harper, supra, at 531. (emphasis added).
This Court quoted with approval the observations of Professors Malone and Johnson on the subject:
"The net result of years of interpretative jurisprudence seems to be that if the `result' of an event or series of events is `accidental' (and certainly almost any injury or change in the physical structure of the body would classify as `accidental'), the requirements of this section of the Act are satisfiedwithout regard to whether the `cause' was accidental. Malone-Johnson, 2d Ed. 214, p. 435." Harper, supra, at 531. (emphasis added).
Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972), cited with approval in both Hall and Harper, involved a sawmill worker who received less pay than he had expected, became extremely irate, and engaged in an angry discourse. During this discourse he felt a sudden flash of pain which was the onset of a disabling stroke. The court found that there was a specific event amounting to an accident because it was "unexpected and unforeseen" and "it happened suddenly and violently," and noted:
"It is well established in Louisiana that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. Bertrand v. Coal Operators Casualty Company, 253 La. 1115, 221 So.2d 816." Ferguson, supra, at 869.
Thus we note that while the language of Hall, Harper, and Ferguson are all supportive of this plaintiff, in both Hall and Harper, which seem to spring from Ferguson, there was a final and conclusive breakdown, just as there was in Ferguson.
There are cases from other circuits however, where a final climactic breakdown is not apparent. In Gales v. Great Atlantic & Pacific Tea Co., 342 So.2d 241 (La.App. 4th Cir.1977), the Fourth Circuit compensated a boner and trimmer who suffered temperature changes some 150 times a day while going in and out of a cooler. The medical evidence indicated that this action was the probable cause of the aggravation of the plaintiff's dormant rheumatoid arthritis. Also in Ferrand v. Kaiser Aluminum & Chemical, 398 So.2d 37 (La.App. 4th Cir. 1981), a five judge panel of that court decided, by virtue of a 3-2 decision, to compensate an industrial worker who contracted folliculitis. That plaintiff worked regularly in an aluminum plant at a particular occupation which was housed in a very hot and humid room. The disease contracted is essentially a condition of boils and cysts on the scalp. The medical evidence was that the condition's cause is unknown, but that excessive sweating and working in a warm climate can contribute thereto. In Geist v. Martin Decker Corp., 313 So.2d 1 (La.App. 1st Cir.1975), the plaintiff alleged that she had contracted hepatitis as a result of eating tainted fish at a restaurant while on company business. The First Circuit reversed the trial court's dismissal of plaintiff's claims, and reinstated plaintiff's claimsholding that they constituted a cause of action in workers' compensation. In Gotte v. Cities Service Oil Co., 298 So.2d 920 (La.App. 3d Cir.1974), the Third Circuit *829 afforded a plaintiff medical expenses sought under the compensation act as a result of his contraction of pneumonia. He was a welder who, in the course of his employment, was required to go in and out of a high temperature environment.
Finally we note Parks v. Insurance Company of North America, 340 So.2d 276 (La. 1976), where the Supreme Court compensated a seamstress who had contracted bronchitis as a result of continuous contact with the dust and lint routinely present in her work place. The plaintiff in Parks was predisposed to bronchical problems from childhood and suffered a sore throat, cough and other upper respiratory symptoms after engaging in that line of employment. The plaintiff eventually contracted several degrees of fever on a specific date. The medical testimony was to the effect that the exposure to the dusty condition was an aggravating factor, if not the cause of the bronchitis.
In compensating the plaintiff, our high court summarized the applicable law:
"We note at the outset that the courts of this state have consistently accorded the terms of the Workmen's Compensation Act a liberal construction in order to effectuate its beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce. Danielsen v. Security Van Lines, Inc., 245 La. 450, 158 So.2d 609 (1963); Geist v. Martin, Decker Corp., 313 So.2d 1 (La.App. 1st Cir.1975). Louisiana is among the many jurisdictions that look to the employee to determine whether there was an unexpected and catastrophic effect upon him in deciding that an injury is accidental. Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972). We have held that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972); Bertrand v. Coal Operators Casualty Co., 253 La. 1115, 221 So.2d 816 (1968). More particularly, we have recognized that the fact that a condition may commonly be referred to as an illness or disease does not thereby preclude its classification as an accident. Jennings v. Louisiana Southern Life Insurance Co., 290 So.2d 811 (La.1974). In Jennings, we noted that among other conditions frequently termed as diseases, heart disease, stroke, heat stroke, herpes zoster (shingles), cancer and `bends' have all bend treated as compensable accidents within the contemplation of the Workmen's Compensation Act." Parks, supra, at 281. (emphasis original).
In our review of the jurisprudence of this Circuit, we have been unable to locate any case where the plaintiff was compensated by this court in the absence of a final giving way or breaking down such that a single specific incident could be pointed to as the "accident." However, the other circuits have apparently not been so strict. We likewise believe the Supreme Court of this state has determined, by virtue of Ferguson, supra, and particularly Parks, supra, that the definition of "accident" in our compensation act does not require a final conclusory event. In our view the current jurisprudential definition is such that an "accident" has occurred within the meaning of the compensation act where the conditions of employment provide continual strain or trauma as here, or exposure, as in Parks, supra, and these events cumulatively combine to aggravate a pre-existing condition so as to disable the employeeeven though each individual event in itself is very minor in character.
A contrary result would indeed be incongruous. We suggest that a compensation scheme that compensates an employee because his degenerative condition suddenly collapses from the continual strain, trauma or exposure in his work place, but does not compensate the employee whose condition deteriorates over a period of time to the extent he cannot work, but does not actually suffer a "collapse", is logically inconsistent. *830 It does not make sense to repair the balloon that suddenly bursts from being slowly over expanded and leave unrepaired the one that gradually collapses from a slow leak.
Our plaintiff had a pre-existing defect of the feet. It is too well settled to require citation that the employer takes the plaintiff as he finds him. This plaintiff's occupation required him to be constantly standing or walking. He often carried loads up to 100 pounds as his deteriorating feet repetitively impacted hard surfaces. As we have already noted, both treating doctors were of the view that plaintiff's employment significantly contributed to his foot problems. The only issue is whether an accident has occurred within the meaning of the act. We have determined, in accordance with our understanding of the current definition of that term, that the toll taken on plaintiff's degenerative foot condition by his constant standing and walking satisfies the current jurisprudential definition of "accident" in the compensation act.
Plaintiff contends that defendants were arbitrary and capricious in denying compensation and seeks penalties and attorneys' fees. We would be remiss if we did not state that we view this as a "close" case and note that the trial judge denied benefits. Under these circumstances the defendants were clearly not arbitrary and capricious and the claim for penalties and attorneys' fees is denied.
Next, the plaintiff contends that he is totally and permanently disabled as per LSA-R.S. 23:1221(2) by virtue of the inclusion of the "odd-lot" doctrine in our jurisprudence by Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980).
The burden is on the plaintiff to prove that he is subject to the "odd-lot" doctrine. Oster, supra. In our view, the evidence in this cause does not support the proposition that the plaintiff, because of his impairment, mental capacity and education cannot perform substantial and material parts of some gainful work with reasonable continuity. Oster, supra. While there is some evidence that the plaintiff cannot do the work he was doing at the time his disability commenced or other work requiring constant standing or walking, we can envision many occupations for which the plaintiff may well be suited.
While a four judge majority of this Court believes that a compensable "accident" has occurred, it is the view of three of these judges that the plaintiff was totally disabled for a specific period of time.[1] In determining the time span for which the plaintiff may claim total disability, these judges are guided by the Supreme Court's pronouncements in Parks, supra. As the Supreme Court announced in Parks, while a plaintiff is entitled to compensation for the duration of his job related disability, he is not entitled to compensation for any time period subsequent to the restoration of his health. It is the view of the majority that the plaintiff has recovered from the injuries and disability caused by his work activity, and that any present disability is due to plaintiff's pre-existing bad feet and poor circulation problems.
In applying the rule of Parks, this Court holds that the plaintiff is entitled to compensation from the date of his operation, on August 1, 1980, until Dr. Simonton found that he was able to return to work, on July 28, 1981. Plaintiff is thus entitled to 52 weeks worth of benefits. Under LSA-R.S. 23:1221(1), plaintiff is entitled to 66 2/3% of his average weekly wage during the 52 week period of temporary total disability. The evidence indicates that claimant's average weekly salary at the time of the operation was $330.20.
However, claimant may not recover a full 2/3 of his weekly wage of $330.20 since his recovery must be adjusted downwards to conform to the statutory limits imposed by LSA-R.S. 23:1202(2). LSA-R.S. 23:1202(2) mandates that the maximum amount recoverable in compensation proceedings *831 is 2/3 of the average weekly wage paid, at the time of the disability, "in all employment subject to the Louisiana Employment Security Law." The average weekly wage for the 12 month span during which plaintiff because disabled was $222.08 and 2/3 of this amount is $148.04. The maximum amount recoverable by plaintiff for his injuries is thus $148.04 per week. Plaintiff is accordingly entitled to 52 weeks worth of benefits at the rate of $148.04 per week.
The plaintiff is also entitled to reimbursement, under LSA-R.S. 23:1203, for the medical expense occasioned by his job-related disability. Operating podiatrist, Dr. Denny Gamble, charged plaintiff $5,492.19 for the medical services rendered by him. The amount charged by Dr. Willis may not be recovered since plaintiff did not establish this amount. Plaintiff may additionally recover for the witness fees charged by medical experts. LSA-R.S. 23:1142; Tyler v. Owens Illinois, Inc., 289 So.2d 893 (La.App. 4th Cir.1974); Zimmerman v. United Machinery Corp., 208 So.2d 336 (La.App. 4th Cir.1968). Dr. Gamble's witness fee was $175.00 and Dr. Simonton charged $150.00 for his testimony. Dr. Willis's witness fee was never established.
Plaintiff is therefore entitled to 52 weeks worth of compensation at the rate of $148.04 per week, for a total of $7,698.08. Plaintiff is further entitled to $5,482.19 in medical fees, and $325.00 in witness fees. These sums owed to plaintiff are subject to a credit for amounts previously paid to plaintiff by defendants. The plaintiff testified that he was paid compensation for 8 weeks, but the record does not show the exact amount thereof.
DECREE
It is therefore ordered, adjudged and decreed that the judgment of the trial court is reversed and further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Otis Terry McCoy, and against the defendants, The Kroger Company and Firemen's Fund Insurance Company, for past due compensation in the lump sum of $7,698.08, subject to a credit for compensation previously paid; and judgment in favor of the plaintiff and against the same defendants in the amount of $5,482.19 representing medical expenses; and for appropriate legal interest on the compensation and medical expenses awarded; and further judgment for the expert witness fee of Dr. Gamble at $175.00 and the fee of Dr. Simonton at $150.00, both sums to be taxed as costs herein, with all costs being assessed to defendant-appellees.
REVERSED AND RENDERED.
PRICE, J., dissents and assigns written reasons.
SEXTON, J., dissents in part from the result and assigns written reasons.
PRICE, Judge, dissents.
I respectfully dissent from the majority holding that plaintiff's disability resulted from a work related accident as required by the compensation statute.
The very scholarly opinion of the majority concisely reviews the jurisprudence pertinent to this issue and candidly acknowledges that its view in this instance will be a further judicially imposed erosion of the statutory definition of the term "accident."
In the cases[1] relied on by plaintiff where a pre-existing degenerative condition was aggravated by the employment and recovery was allowed, there was a sudden event in each instance which was relied upon by the appellate court to find an "accident."
In the other group of cases[2] reviewed by the majority, recovery was allowed because *832 of a long-time exposure to some unusual climatic or abrasive condition which either induced a disease or aggravated a prior existing condition.
The instant facts do not fall in either of these two categories. This is simply a situation where the employee was physically unsuited for performance of the routine duties of a grocery stock clerk because of his imperfect feet. It is difficult to conceive of these circumstances meeting the statutory requirement of "an unexpected or unforseen event happening suddenly or violently,... and producing at the time objective symptoms of injury."
The holding of the majority completely emasculates the definition of accident as clearly set forth by the legislature and goes farther than any prior jurisprudence in expanding the definition of this term. Such a course of action does violence to the principles of judicial interpretation of statutory mandates promulgated by the legislature and may have a chilling effect on the ability of persons suffering from slight congenital physical imperfections to find employment.
SEXTON, Judge, dissenting in part.
I respectfully dissent as to the extent of compensation benefits awarded. In my view, the plaintiff herein has suffered partial disability as defined by LSA-R.S. 23:1221(3). The majority is impressed by the testimony of Dr. Simonton that the plaintiff is able to return to work. However the podiatrist, Dr. Gamble, testified that the condition of plaintiff's feet at the time of trial would prevent Terry McCoy from returning to his previous occupation. Although Dr. Willis felt that the plaintiff's feet were in the same condition at the time of trial as before any compensable "accident," he testified that a return to the same or similar employment would cause a recurrence of plaintiff's foot problems.
It is of course axiomatic that the opinion of treating physicians is entitled to greater weight than that of the physician examining the plaintiff for the purposes of litigation. Schouest v. J. Ray McDermott & Co., Inc., 411 So.2d 1042 (La.1982); Harris v. Argonaut Ins. Co., 142 So.2d 501 (La.App. 2d Cir.1962). Additionally, even though Dr. Simonton felt the plaintiff was able to return to work, he stated that if plaintiff was in fact experiencing severe swelling and discoloration, "he shouldn't do a standing type of work." Therefore, I believe the medical evidenceeven when viewed in the light most favorable to defendantsis that this plaintiff will suffer a recurrence of the previously disabling condition if he returns to the same or similar employment. Under those circumstances, I believe he is entitled to partial permanent disability in accordance with LSA-R.S. 23:1221(3).[1]
Parks v. Insurance Company of North America, 340 So.2d 276 (La.1976), which was relied on by the majority, was based on the law in effect prior to the enactment of Act 583 of 1975. Prior to 1975, the "permanent partial disability" provision of the then existing LSA-R.S. 23:1221(3) was seldom relied on.[2] But the Compensation Act as amended in 1975 provides a viable partial disability provision which has been often used, and which in my view has changed the law in this respect.
I believe that Allor v. Belden Corp., 393 So.2d 1233 (La.1981) makes it clear that Parks, supra, has been superceded by the new law. The Allor court cited Parks for another proposition but found the plaintiff to be partially disabled within the meaning of LSA-R.S. 23:1221(3).
The plaintiff in Allor was prone to lumbosacral sprain. The evidence indicated that he was restored to his original condition *833 by medical treatment, but that his disability was likely to recur if he returned to the same employment. The court declared the plaintiff partially disabled since he could no longer perform the duties in which he was customarily engaged and "resumption of heavy manual labor would be detrimental to [his] health and likely cause recurrence of his back problem."
To the same effect is Schouest, supra, in which the plaintiff contracted silicosis as a result of his employment as a sand blaster and could not return to his former occupation in a silica-filled atmosphere. The court expressly found him able to perform moderate to heavy work in a silica-free environment. Thus, while the plaintiff was basically restored to his former condition, he was held to be partially disabled under LSA-R.S. 23:1221(3) since he could not return to the duties in which he was customarily engaged or for which he was fitted by education, training and experience.
I would therefore award the plaintiff benefits for partial disability in accordance with LSA-R.S. 23:1221(3), and thus I respectfully dissent from the result reached herein.
NOTES
[1] The designated author is in disagreement with the other members of the majority herein as to the extent of the plaintiff's disability, as will be discussed in a separate partial dissent.
[1] Lum v. Employers Mut. Lia. Ins. Co. of Wis., 216 So.2d 889 (La.App. 2d Cir.1968); Hall v. Georgia-Pacific Corp., 390 So.2d 948 (La.App. 2d Cir.1980); Harper v. Kast Metals Corp., 397 So.2d 529 (La.App. 2d Cir.1981); Ferguson v. HDE, Inc., 270 So.2d 867 (La.1972).
[2] Gales v. Great Atlantic & Pacific Tea Co., 342 So.2d 241 (La.App. 4th Cir.1977); Ferrand v. Kaiser Aluminum & Chemical, 398 So.2d 37 (La.App. 4th Cir.1981); Gotte v. Cities Service Oil Co., 298 So.2d 920 (La.App. 3d Cir.1974); Parks v. Insurance Company of North America, 340 So.2d 276 (La.1976).
[1] If the worker chooses to accept disability benefits rather than obtaining employment for which he is still suited, then this is arguably an inequitable result. However, I believe it to be the correct state of the law. Justice Lemmon's concurring opinion in Schouest, supra, at p. 1049, is surely the better course.
[2] See Malone and Johnson, Civil Law Treatise, Worker's Compensation, § 275 (1980). See especially, Note 65, at p. 616.